(No. 82-CC-2210– )

WALTER MCINTYRE, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 19, 1987.*

FRED AIOSSA, for Claimant.

NEIL F. HARTIGAN, Attorney General (JOHN BUCKLEY, Assistant Attorney General, of counsel), for Respondent.

RAUCCI, J.

This is a claim brought by Claimant, Walter McIntyre, for personal injuries sustained by him on October 30, 1981, while he was a resident at Stateville Correctional Center. On the date in question, an electronic gate closed on Claimant's right arm severely injuring his right biceps.

Claimant worked in the general kitchen as a utility man. At about 4:00 p.m. on the day in question, he was assigned to take a cart containing coffee and cookies to A and B dining rooms. He delivered what he had to deliver to A dining room and was on his way to B dining room when a guard snatched a package of cookies off the cart as Claimant and his cart passed in front of D house gate.

The gate to D house is an electronically operated gate constructed out of bars. Six feet of the gate is stationary and another six feet of the gate slides on a track past the stationary part of the gate. The gate is operated by employees in a control room watching

cameras and taking voice commands from officers via walkie-talkie radios.

When the guard took the cookies the gate was open and he walked through the gate. Whoever was operating the gate closed it after the guard went through.

Claimant called after the guard to return whatever he had taken from the wagon.

"Q. What were you calling him for?

A. To get whatever he took off the wagon back.

Q. Why was it important to get those back?

A. When I leave the kitchen and B called for us to bring food or coffee to the dining, when I left the kitchen if I don't show up to the dining room with whatever I left the kitchen with, I get disciplinary report wrote up on me, because inmates have been known to steal stuff out of the kitchen.

I would have been accused of it, written up with a disciplinary report written up on me, and possibly put in segregation or C grade or whatever, and I was trying to avoid a ticket which was a disciplinary report.

Q. So, you said you called this guard.

How did you call him and by what means?

A. I called the officer.

Q. Did you know him by name?

A. No.

Q. What else did you do to attract his attention?

A. He stopped when he got halfway down the tunnel, because after you go through the gate, there is a tunnel before you get to C house which is about a block or so long.

Got halfway down the tunnel and asked me what I wanted. I asked him to bring back what he took off the wagon, and he said I don't have nothing.

I pointed to what he had in his hand.

Q. Which arm did you use to point?

A. Right arm.

Q. Where was your arm when you started pointing to what he had?

A. When I first pointed, he acted as if he couldn't see me which he could from as far as I could see, but I stick my hands through the bars and pointed directly at what he had, and that is when whoever was operating the gate . . . ." (Tr. 8-10)

In other words, to better use his right hand to point at the object in the officer's hand, Claimant thrust his right arm through the stationary part of the gate. At that point an employee in the control room opened the gate and crushed Claimant's right arm in the area of his biceps.

The gate opened when it did because Officer Cook, by radio, called the control office to open the gate, without noticing that Claimant had his arm through the stationary portion.

First we will consider the report filed by Officer Cook:

"I Officer Cook was going into D-House tunnel, Resident McIntyre was standing at the gate with his arm through the bars. Control center opened the gate and Resident McIntyre's arm smashed between the two gates.

I signalled the control center to release Resident McIntyre's arm." (Resp. Ex. 1)

Next we will consider his testimony:

"Q. When you approached the D gate at this particular time, was the gate open or closed?

A. It was closed.

Q. And where was Resident McIntyre with regard to the gate?

A. He was standing on the stationary side of it.

Q. What was he doing there?

A. Talking.

Q. Who was he talking to?

A. I don't know who he was talking to. He was talking to someone standing in the tunnel.

Q. Was that someone in the tunnel an officer or an inmate?

A. I don't know. I'm not sure.

Q. Then what happened?

A. Then I called over the radio to have them open the gate so I could go inside the tunnel.

Q. And after you called the radio, did the gate begin to open?

A. Yes.

Q. Then what happened?

A. Then I noticed his arm was through the gate, and it smashed, and so I could tell them to close it . . . ." (Tr. 51-52)

When Officer Cook realized that Claimant's arm was caught in the gate, he began to wave his arm in front of the camera to get the attention of the operator in the control room. But waving to attract the attention of the operator was futile, because apparently no one was watching the screen. He had to call the operator over his radio in order to get the control room's attention to close the gate and release Claimant's arm. The fact that the gate had not opened far enough to permit anyone to go through but, in fact, wedged Claimant's arm between it and the stationary bars escaped the attention of those in the control room. A minute elapsed before an operator in the control room pressed a button to close the gate.

"Q. Between the time Mr. McIntyre's arm was first caught in the gate and the time you called the control center telling them to close the gate releasing Mr. McIntyre's arm approximately how much time passed, if you can recall?

A. About a minute." (Tr. 53; also see Tr. 28).

On cross-examination Officer Cook elaborated further:

"BY MR. AIOSSA

Q. Officer Cook, drawing your attention back to the statement exhibit when you read it, you said McIntyre's arm was smashed between the gate. The last sentence is actually I signalled the control center to close the gate to release his arm?

A. I was waving in front of the camera.

Q. You heard Mr. McIntyre testify he heard a guard call, was that you?

A. I was standing behind him.

Q. You had a walkie-talkie, then you are the one that called to the control center?

A. Yes.

Q. The control center didn't close the gate on its own—

MR. BUCKLEY: Objection to the part. of the question.

BY MR. AIOSSA:

Q. You signalled the control center to close that gate?

A. Yes.

Q. Thereby releasing Walter McIntyre's arm?

A. Yes.

Q. The control center didn't do it until you called, correct?

A. *No, they didn't know what was happening."*
(Tr. 53, 54)
(Emphasis supplied.)

He summarized the matter as follows:

"Q. So, if the control center had seen what was going on, they could have closed the gate immediately, correct?

A. Yes.

Q. But there was a lapse of time of approximately a minute, but they actually closed it?

A. Yes.

Q. And they didn't close it until you actually notified them, correct?

A. Yes, I called them over the radio.

Q. It wasn't until they got your radio communication until they actually closed it, correct?

A. Yes." (Tr. 55)

The Claimant has proven negligence on the part of Respondent in the following particulars:

1. Officer Cook was negligent in not noticing that Claimant's arm was thrust through the stationary part of the gate when he, Cook, called the control room by radio to open the gate. This appears in both Officer Cook's written statement and in his testimony.

2. At all times during this incident, both on opening the gate at Cook's request, and on closing it at Cook's request, the control center relied exclusively on his radio calls. Either the lighting was so poor around the gate that it could not see the gate over the monitoring system, or the operator paid no attention to the screen.

Two of the employees in the control room gave written statements which would appear to be falsehoods. It should be remembered that Officer Cook testified that after Claimant's arm was caught in the gate he tried to attract the attention of the control room by waving in front of the camera. "I was waving in front of the camera." But, the control center didn't close the gate until he called on the radio.

"Q. The control center didn't do it until you called, correct?

A. *No, they didn't know what was happening.*"

The statements of the two employees are reproduced below:

First is that of Richard J. Watson:

"On the above date and time I was given the sign from Officer Cook to open the tunnel gate D. However, Resident McIntyre was leaning on the gate as it was opening he also placed his arm through the gate and was caught between the moving gate."
(Resp. Ex. 2)

If he saw this happen, why then did he not immediately release Claimant's arm? Why was Officer Cook's arm waving futilely? Why was the gate not released until Officer Cook's radio call? Why did Claimant have to endure almost a minute with his arm crushed in the gate?

Second is that of Katie Banks:

"On the above date and time while I c/o Katie Banks was working the control center I saw Res. McIntyre appear to deliberately push his arm into the D gate just as it was opening up." (Resp. Ex. 3). (Also see her statement repeated in Resp. Ex. 4).

If she saw all of that happening why did she not tell c/o Watson to close the gate? Why the delay in getting Claimant's arm out of the gate?

There is dispute in the record as to what warning signs are posted at the gate.

Warden DeRobertis, in a memorandum, stated that there were "posted warnings to keep arms, hands, and legs clear of the gate bars." However, the Adjustment Committee summary signed by Captain Hall merely states that there are signs posted at gates "stating not to

tamper." (Corroborated by Claimant's testimony Tr. 19, 20).

Given the urgency Claimant felt about reclaiming the cookies taken by the unknown officer, we do not believe he was guilty of contributory negligence in thrusting his arm through the gate to better point to the package in the officer's hand. The greater negligence was that of Officer Cook and correctional officers Watson and Banks. At the most his negligence would have to be given a fractional valuation.

Claimant ran unassisted to the dispensary a half block away. From there he was taken to the institution hospital. There, he was given X rays and sent back to the cellhouse.

"Q. And they didn't keep you up at the hospital at all?

A. No, they told me it was soft tissue damage, and it would be okay. They gave me something for pain and sent me back to the cell." (Tr. 22).

On November 24, 1981, he was examined by an orthopedic surgeon in Joliet, Illinois, who found:

"The patient struck his arm about the junction of the proximal or middle third of his right humerus of the anterior aspect with a door. *He has no biceps. The biceps does not contract.*" (Cl. Ex. 2) Emphasis supplied.

### Dr. Gerald J. Rabin, M.D., stated in his report:

"Coordination of the upper extremities are equal and normal. The patient has weakness of the whole right upper arm, from the shoulder down. Biceps and triceps reflexes are present and equal. The patient has hypesthesia of the right forearm, and to the right elbow down. There is an atrophy of the upper third of the right arm, tenderness of the right arm. *The patient has a huge muscle defect of the right biceps*, the short head of the medical biceps tendon, medial aspect. The patient has a whole marked deformity of the whole biceps muscle and its attachment. The inferior attachment is intact. The long head of the biceps are intact. The short head is absent, with marked deformity of the whole biceps. The patient has equal and normal motion of

the left shoulder, both elbows and wrist joints. Motion of the right shoulder is limited, with marked weakness of the long head of the biceps as well as absence of the short head of the biceps. Strength and motion of the right hand, fingers, and thumb is limited. . . .

DIAGNOSIS:

A Defect of the upper third of the biceps in the region of the upper third of the biceps muscle, with an apparent tear of the short head of the biceps.

COMMENT:

At this time the patient is in need, I think of (sic) *surgical repair should have been done of the short head of the biceps, and possibly the long head of the biceps at the time of the injury.* At this time the patient could be helped by an intensive course of physiotherapy and exercises as well as possible surgical repair of the biceps muscles and their short and long heads." (Cl. Ex. 3) (Emphasis supplied.)

The Claimant was 24 years old at the time of the accident. The injury is permanent and will require surgery, although complete recovery is highly unlikely. Claimant's testimony indicates that he has attempted gainful employment since his release from State custody, but has been terminated because of his inability to perform physical tasks with his injured arm. Considering the entire record in this case, Claimant is entitled to an award of $60,000.00.

It is therefore ordered, adjudged and decreed that Claimant is awarded $60,000.00 in full and complete satisfaction of this claim.